**[J-47-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| JASON WINIG, | : | No. 32 EAP 2023 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court entered on |
| | : | February 24, 2023, at No. 1423 CD |
| v. | : | 2021, affirming the Order of the |
| | : | Court of Common Pleas of |
| | : | Philadelphia County, Civil Division, |
| THE OFFICE OF THE DISTRICT | : | entered on June 21, 2021, at |
| ATTORNEY OF PHILADELPHIA, | : | No. 200600251. |
| LAWRENCE S. KRASNER, ESQUIRE, | : | |
| BRANWEN MCNABB, ESQUIRE, | : | ARGUED:  September 10, 2024 |
| MICHELLE MICHELSON, ESQUIRE, | : | |
| WILLIAM BURROWS, ESQUIRE AND | : | |
| HELEN PARK, ESQUIRE, | : | |
| | : | |
| Appellees | : | |

**OPINION**

**JUSTICE BROBSON**                                          **DECIDED: November 19, 2025**

The Wiretapping and Electronic Surveillance Control Act (Wiretap Act or Act), 18 Pa. C.S. §§ 5701-5782, generally governs the legality of interceptions, disclosures, and use of oral, electronic, and wire communications between and among persons. *Commonwealth v. Byrd*, 235 A.3d 311, 319 (Pa. 2020).  The Wiretap Act allows parties aggrieved by violations of the Act to seek monetary damages by way of civil litigation. 18 Pa. C.S. § 5725(a).  Appellant Jason Winig (Winig) pursued such an action against the District Attorney of Philadelphia and several of his assistant district attorneys for their roles in unsuccessfully attempting to prosecute Winig by utilizing recordings of

conversations between Winig and his ex-wife, Jessica Braverman (Braverman), which Braverman surreptitiously captured when they were married. We are tasked with considering whether, under these circumstances, high public official immunity shields district attorneys and assistant district attorneys from facing civil suits seeking monetary damages for their alleged violations of the Wiretap Act that occurred while they were acting within the scope of their official duties. Like the Commonwealth Court, we hold that high public official immunity protects district attorneys and assistant district attorneys from such suits. Accordingly, we affirm the Commonwealth Court's order.

## I. BACKGROUND

Acting *pro se*, Winig filed a civil complaint in the Court of Common Pleas of Philadelphia County (trial court) pursuant to Section 5725(a) of the Wiretap Act (Civil Action).[1] The complaint named the following parties as defendants: Lawrence Krasner, the District Attorney of Philadelphia (DA Krasner); several Assistant District Attorneys for Philadelphia, namely, Branwen McNabb (ADA McNabb), Michelle Michelson (ADA Michelson), William Burrows (ADA Burrows), and Helen Park (ADA Park) (collectively

___

[1] Section 5725(a) of the Wiretap Act provides:

**(a) Cause of action.--**Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person:

(1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher.

(2) Punitive damages.

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

18 Pa. C.S. § 5725(a).

Prosecutors); and the Office of the District Attorney of Philadelphia (DA Office). After Prosecutors filed preliminary objections to the original complaint, Winig filed a counseled amended complaint. The amended complaint alleged as follows.

Winig and Braverman married in January of 2011, separated in March of 2018, and divorced in August of 2019. During their marriage, Braverman surreptitiously recorded conversations that she had with Winig (Recordings). When Winig informed Braverman that he wanted a divorce, Braverman immediately filed for a protection from abuse order against Winig, alleging that he sexually assaulted her and abused their two young children. Braverman also filed a report with the Philadelphia Police Department (Police Department or Department), making the same allegations against Winig.

In support of the report that she filed with the Police Department, Braverman gave the Recordings to the Department. Based upon Braverman's allegations and the Recordings, ADA McNabb authorized Winig's arrest, which led to Winig having no contact with his children for five months.[2] Winig learned of the Recordings during the criminal and family court proceedings that followed his arrest.

Prosecutors represented the Commonwealth in Winig's criminal case (Criminal Action). Prosecutors used and disclosed the Recordings throughout their attempt to bring Winig to trial in the Criminal Action. The trial court in the Criminal Action, however, ultimately determined that Braverman made the Recordings in violation of the Wiretap Act. As a result, the trial court entered an order prohibiting the Commonwealth from utilizing the Recordings as evidence in the Criminal Action. All criminal charges lodged against Winig eventually were either dismissed or withdrawn.

---

[2] According to Winig's original complaint, the Commonwealth charged him with "forcible rape, strangulation, and a litany of other serious felony charges." (Complaint, 2/9/2021, at 6.)

Winig's amended complaint in the Civil Action contained three counts, but only two of the counts are relevant to this appeal. Under the first count, Winig explained that Section 5703(2) of the Wiretap Act makes it unlawful for any person to "intentionally *disclose*[] or endeavor[] to disclose to any other person the contents of any . . . oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a[n] . . . oral communication." (Amended Complaint, 3/22/2021, at ¶53 (quoting 18 Pa. C.S. § 5703(2)) (emphasis added).) Under count two, Winig reported that Section 5703(3) of the Wiretap Act makes it unlawful for any person to "intentionally *use*[] or endeavor[] to use the contents of any . . . oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a[n] . . . oral communication." (Amended Complaint, 3/22/2021, at ¶58 (quoting 18 Pa. C.S. § 5703(3)) (emphasis added).)

Winig averred that, throughout the Criminal Action, Prosecutors intentionally disclosed and used the contents of the Recordings, violating Sections 5703(2) and 5703(3) of the Wiretap Act. As a result, Winig purported to suffer, *inter alia*, embarrassment and harm to his reputation. Winig also maintained that Prosecutors' actions required him to expend funds to prevent further disclosure and dissemination of the Recordings. Winig contended that he was entitled to recover monetary damages under the Wiretap Act, including actual and punitive damages, as well as reasonable attorney's fees and other costs related to litigating the Civil Action.

Prosecutors filed preliminary objections in the nature of demurrers to the amended complaint.[3] Relevant to this appeal, Prosecutors contended that high public official

---

[3] *See* Pa.R.Civ.P. 1028(a)(4) (providing that preliminary objections may be filed by any party to any pleading based on legal insufficiency of pleading).

immunity sheltered them from litigating this lawsuit.[4]   In response to Prosecutors'
preliminary objections, Winig argued that the General Assembly waived high public official
immunity for purposes of the Wiretap Act.   Winig relied upon Section 5725(b) of the
Wiretap Act, which provides:   "To the extent that the Commonwealth and any of its
officers, officials or employees would be shielded from liability under this section *by the
doctrine of sovereign immunity*, such immunity is hereby waived for the purposes of this
section."  18 Pa. C.S. § 5725(b) (emphasis added).

---

[4] Prosecutors also took the position, which they have maintained throughout this litigation, that prosecutorial immunity separately protects them from facing suit under Section 5725(a) of the Wiretap Act.  In doing so, however, Prosecutors have relied almost exclusively on federal case law addressing prosecutors' liability under 42 U.S.C. § 1983. (*See, e.g.*, Memorandum of Law in Support of Defendants' Renewed Preliminary Objections, 4/12/2021, at 7 (citing, among other cases, *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976) (holding "only" that, "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under" 42 U.S.C. § 1983), and *Miller v. Nelson*, 768 A.2d 858, 861 (Pa. Super. 2001) (relying on *Imbler* in support of proposition that "prosecutor enjoys absolute immunity from liability for civil damages for actions related to prosecution of a criminal case").)   Moreover, as will become clear below, a close reading of the Commonwealth Court's opinion reveals that the court decided this matter solely on the basis of high public official immunity, which is well established in Pennsylvania case law.  We do the same in resolving this appeal.  As such, we will not discuss prosecutorial immunity any further in this opinion.  This should not be construed as rejecting or endorsing the viability of prosecutorial immunity in this Commonwealth.

Of further note, in their preliminary objections to Winig's initial complaint, Prosecutors contended, *inter alia*, that, to the extent that Winig claimed that the DA Office was liable for the conduct of its employees, governmental immunity shielded the DA Office from litigating this suit.  (Preliminary Objections, 3/1/2021, at ¶33).  Governmental immunity is codified in what is commonly referred to as the Political Subdivision Tort Claims Act, 42 Pa. C.S. §§ 8541-8542, and, in specified circumstances, extends immunity to local governmental agencies.  *See* 42 Pa. C.S. § 8541 (explaining that, except as otherwise provided in Political Subdivision Tort Claims Act, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person").  Importantly, Prosecutors did not raise governmental immunity in their preliminary objections to Winig's amended complaint.  Accordingly, we do not address whether governmental immunity applies in this matter.

The trial court determined that the General Assembly waived only sovereign immunity in Section 5725(b) of the Wiretap Act, not high public official immunity. The trial court, therefore, concluded that high public official immunity insulates Prosecutors from Winig's suit. Consequently, the trial court sustained Prosecutors' preliminary objections and dismissed Winig's claims with prejudice. Winig timely filed a notice of appeal.

On appeal, Winig argued to the Commonwealth Court, in relevant part, that the trial court erred in sustaining Prosecutors' preliminary objections because Section 5725(b) of the Wiretap Act waives high public official immunity. He contended that the trial court incorrectly limited "the scope of the term sovereign immunity in Section 5725(b) of the Wiretap Act because it rendered the waiver provision meaningless." *Winig v. Off. of Dist. Att'y of Phila.* (Pa. Cmwlth., No. 1423 C.D. 2021, filed February 24, 2023), slip op. at 5. Prosecutors took the position that "the trial court correctly concluded [that] . . . high public official immunity barred Winig from receiving damages under the Wiretap Act." *Id.* Prosecutors insisted that they were operating within the scope of their duties when they utilized the Recordings and that they had a good faith belief that the Recordings did not violate the Wiretap Act.

A three-judge panel of the Commonwealth Court unanimously affirmed the trial court's order by way of a memorandum opinion and order. *Id.* Responding to the parties' arguments, the Commonwealth Court observed that "[h]igh public official immunity is a category of common law immunity that acts as an absolute bar to protect high public officials from lawsuits arising out of actions taken in the course of their official duties and within the scope of their authority." *Id.*, slip op. at 10 (citing *Doe v. Franklin Cnty.*, 174 A.3d 593, 603 (Pa. 2017)). The court emphasized that high public official immunity is an "absolute privilege" and that the scope of this immunity is "very broad," as it "is unlimited and exempts a high public official from all civil suits for damages arising out

of . . . actions . . . provided the . . . actions are taken in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed, within his jurisdiction." *Id.* (quoting *Durham v. McElynn*, 772 A.2d 68, 69 (Pa. 2001)). The court further observed that Pennsylvania law holds that high public official immunity applies to district attorneys and assistant district attorneys, like Prosecutors. *Id.*, slip op. at 11 (relying on *Durham*, 772 A.2d at 69-70).

As to whether the General Assembly waived high public official immunity for purposes of Section 5725(a) of the Wiretap Act, the Commonwealth Court noted that courts must strictly construe exceptions to immunity and may find that immunity has been waived only when the General Assembly expressly provides for such waiver. *Id.* (citing *Doe*, 174 A.3d at 607-08). The Commonwealth Court acknowledged that Section 5725(b) of the Wiretap Act "expressly and specifically" waives sovereign immunity, but it pointed out that the statute is silent as to high public official immunity. *Id.*, slip. op. at 12. To determine whether the General Assembly nevertheless intended to waive high public official immunity for purposes of Section 5725(a), the Commonwealth Court engaged in statutory construction. In this regard, the Commonwealth Court opined that, "[w]hile law enforcement officers would fall under the definition of 'persons' under the Wiretap Act, the General Assembly chose to carve out a separate definition to address those individuals."[5]

---

[5] The Wiretap Act defines "person" as: "Any employee, or agent of the United States or any state or political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. C.S. § 5702. The Wiretap Act defines "investigative or law enforcement officer" as:

> Any officer of the United States, of another state or political subdivision thereof or of the Commonwealth or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter or an equivalent crime in another jurisdiction, and *any attorney authorized by law to prosecute or participate in the prosecution of such offense*.

*Id.* (emphasis added).

*Id.*, slip. op. at 13. In the Commonwealth Court's view, "[i]f the General Assembly intended to abrogate otherwise applicable immunity for 'law enforcement officers,' it could have used the defined term in Section 5725." *Id.*

The Commonwealth Court further highlighted that other sections of the Wiretap Act specifically apply to law enforcement officers. For example, Section 5726(a) of the Wiretap Act, 18 Pa. C.S. § 5726(a), provides a cause of action against law enforcement officers, allowing an aggrieved party to bring a suit seeking the removal of the officer for an intentional violation of the Act.[6] "Notably," the Commonwealth Court opined, "consistent with the doctrine of high public official immunity, this section makes no mention of permitting a party to sue for damages in a suit against law enforcement officers." *Id.*

Turning to Section 5717 of the Wiretap Act, the Commonwealth Court observed that "the General Assembly specified that a law enforcement officer who obtains knowledge, by any authorized means, of the contents of any oral communication may use the contents to the extent such use is appropriate to the proper performance of the officer's official duties." *Id.* (citing 18 Pa. C.S. § 5717). The Commonwealth Court then summarized this Court's decision in *Karoly v. Mancuso*, 65 A.3d 301 (Pa. 2013), which involved a criminal defense attorney's attempt to have a detective and an assistant district

---

[6] Section 5726(a) of the Wiretap Act provides:

> Any aggrieved person shall have the right to bring an action in Commonwealth Court against any investigative or law enforcement officer, public official or public employee seeking the officer's, official's or employee's removal from office or employment on the grounds that the officer, official or employee has intentionally violated the provisions of this chapter. If the court shall conclude that such officer, official or employee has in fact intentionally violated the provisions of this chapter, the court shall order the dismissal or removal from office of said officer, official or employee.

18 Pa. C.S. § 5726(a).

attorney removed from office pursuant to Section 5726(a) of the Wiretap Act. The Commonwealth Court highlighted the portion of the *Karoly* Court's conclusion that the detective and the assistant district attorney properly used disputed recordings insomuch as the use of the recordings occurred within the scope of the duties of the detective and assistant district attorney. *Id.*, slip. op. at 14-15 (quoting *Karoly*, 65 A.3d at 310-11).

Returning to the instant matter, the Commonwealth Court expressed that the plain language of Section 5717 of the Wiretap Act, combined with this Court's application of that language in *Karoly*, leads to the conclusion that "the General Assembly intended for law enforcement officers to be permitted to use information that may otherwise be in violation of the Wiretap Act, so long as it is necessary to the 'proper performance of his official duties.'" *Id.*, slip op. at 15 (quoting 18 Pa. C.S. § 5717(a.1)). Reinforcing its conclusion, the Commonwealth Court reasoned that the General Assembly intended to treat law enforcement officers uniquely under the Wiretap Act and that the Act does not evince any legislative intent to waive high public official immunity for purposes of Section 5725(a) actions. The Commonwealth Court, therefore, held that, because the General Assembly did not "specifically and intentionally" waive high public official immunity in the Wiretap Act, "Prosecutors maintain high public official immunity and may not be held liable under Section 5725 of the Wiretap Act for their use of the Recordings within the performance of their duties prosecuting Winig in the Criminal Action." *Id.*, slip op. at 16. Accordingly, the Commonwealth Court entered an order affirming the trial court's order, which sustained Prosecutors' preliminary objections in the nature of demurrers and dismissed Winig's claims with prejudice. After the Commonwealth Court denied Winig's application for reargument, Winig filed a petition for allowance of appeal in this Court.

## II. ISSUE

This Court granted Winig's petition for allowance of appeal, limited to consideration of the following issue as phrased by the Court: "Whether law enforcement officers are immune from civil suits under Section 5725 of the [Wiretap] Act, 18 Pa. C.S. § 5725?" *Winig v. Off. of Dist. Att'y of Phila.*, 308 A.3d 774 (Pa. 2023) (*per curiam*).

## III. DISCUSSION

### A. Scope and Standard of Review

This appeal is from an order sustaining preliminary objections in the nature of demurrers. Consequently, our standard of review is *de novo*, and our scope of review is plenary. *Raynor v. D'Annunzio*, 243 A.3d 41, 52 (Pa. 2020). A preliminary objection in the nature of a demurrer challenges the legal sufficiency of a pleading. Pa.R.Civ.P. 1028(a)(4). In evaluating such an objection, courts "must consider as true all of the well-pleaded material facts set forth in the complaint and all reasonable inferences that may be drawn from those facts." *Am. Hous. Tr., III v. Jones*, 696 A.2d 1181, 1183 (Pa. 1997). "In conducting our appellate review, we observe that preliminary objections, the end result of which would be dismissal of the action, may be properly sustained by the trial court only if the case is free and clear of doubt." *Id.* at 1184.

### B. Analysis

A brief background regarding the immunities at issue is helpful to resolving this appeal. The doctrine of sovereign immunity has its roots in English common law. *Dorsey v. Redman*, 96 A.3d 332, 340 (Pa. 2014). "The common-law rule was that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him." *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 238-39 (2019) (citation and internal quotation marks omitted). As to the doctrine's current role in our law, we highlight that, "[u]nder the Pennsylvania Constitution, the Commonwealth enjoys

sovereign immunity from lawsuits." *U.S. Venture, Inc. v. Commonwealth*, 255 A.3d 321, 329 (Pa. 2021) (quoting *Sutton v. Bickell*, 220 A.3d 1027, 1034-35 (Pa. 2019)); Pa. Const. art. I, § 11.[7] "The Pennsylvania Constitution confers the legislative branch with the power to permit suits against the Commonwealth at its discretion." *U.S. Venture*, 255 A.3d at 329 (citing Pa. Const. art. I, § 11). "The General Assembly has declared that the Commonwealth 'shall continue to enjoy sovereign immunity . . . and remain immune from suit except as the General Assembly shall specifically waive the immunity.'" *Id.* (quoting 1 Pa. C.S. § 2310).

The General Assembly has defined the contours of sovereign immunity in what is commonly referred to as the Sovereign Immunity Act, 42 Pa. C.S. §§ 8521-8528. *Jones v. Se. Pa. Transp. Auth.*, 772 A.2d 435, 438-39 (Pa. 2001). Pursuant to the Sovereign Immunity Act, "the Commonwealth generally enjoys immunity from suit for damages arising out of negligent acts, subject to certain limits."[8] *Wise v. Huntingdon Cnty. Hous. Dev. Corp.*, 249 A.3d 506, 513 (Pa. 2021). Those limits are enumerated in Section 8522(b) of the Sovereign Immunity Act, 42 Pa. C.S. § 8522(b).[9] "The constitutionally[ ]grounded, statutory doctrine of sovereign immunity obviously serves to protect government policymaking prerogatives and the public fisc." *Sci. Games Int'l, Inc. v. Com.*, 66 A.3d 740, 755 (Pa. 2013).

---

[7] This section of the Pennsylvania Constitution provides, in relevant part: "Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. art. I, § 11.

[8] As noted above, governmental immunity, as codified in the Political Subdivision Tort Claims Act, is applicable to local governmental agencies. *Supra* at 5 n.4. Sovereign immunity is available only to the Commonwealth and its agencies. *James J. Gory Mech. Contracting, Inc. v. Phila. Hous. Auth.*, 855 A.2d 669, 677 (Pa. 2004).

[9] "[T]he General Assembly has also reaffirmed sovereign immunity with respect to government contracts under the [Commonwealth] Procurement Code[, 62 Pa. C.S. §§ 101-2311,] and then waived that immunity in limited circumstances." *MFW Wine Co. v. Pa. Liquor Control Bd.*, 318 A.3d 100, 128 n.43 (Pa. 2024) (citing 62 Pa. C.S. § 1702).

In contrast, high public official immunity is not limited, nor is it constitutionally or statutorily based. Rather, "[i]n Pennsylvania, high public official immunity is a long-standing category of common law immunity that acts as an absolute bar to protect high public officials from lawsuits arising out of actions taken in the course of their official duties and within the scope of their authority." *Doe*, 174 A.3d at 603. "The purpose is to protect the high public official from liability, not for his or her own personal benefit, but for the benefit of the *public* he or she serves." *Id.* (emphasis in original). "Specifically, absolute immunity from civil liability for high public officials is the only legitimate means of removing any inhibition which might deprive the public of the best service of its officers and agencies." *Id.* (citation and internal quotation marks omitted).

Importantly, high public official immunity applies to both district attorneys and assistant district attorneys. *Durham*, 772 A.2d at 70. This is so because the "public interest requires that district attorneys be able to carry out their duties without being hampered by civil suits claiming damages for actions taken in their official capacities." *Id.* "The public would indeed suffer if the prosecution of criminals were impeded, as would be the case if district attorneys were not accorded absolute immunity." *Id.* As to the applicability of this immunity to assistant district attorneys, this Court has explained that assistant district attorneys "are essential to district attorneys in fulfilling responsibilities of their high public offices, to wit, in carrying out the prosecutorial function" and that "[t]o subject assistant district attorneys acting on behalf of the district attorney to liability would deter all but the most courageous and most judgment-proof from vigorously performing their prosecutorial functions, and would inevitably result in criminals going unpunished." *Id.* Of further importance, the doctrine of high public official immunity is alive and well in this Commonwealth. *See Doe*, 174 A.3d at 603 ("This Court has never called into question, much less overruled, the common law doctrine of absolute privilege for high

public officials.") (quoting *Lindner v. Mollan*, 677 A.2d 1194, 1196 (Pa. 1996)); *id.* (explaining that "privilege of immunity has consistently been upheld and was specifically found not to have been abrogated by the legislature").

In addition, we are convinced that the General Assembly understood when it drafted the Wiretap Act that sovereign immunity and high public official immunity are separate concepts, each requiring the explicit waiver of the General Assembly. In support, we note that, on July 14, 1978, this Court issued its decision in *Mayle v. Pennsylvania Department of Highways*, 388 A.2d 709 (Pa. 1978), abolishing the common law defense of sovereign immunity. By the Act of September 28, 1978, P.L. 788 (Act 152), the General Assembly enacted Title I, Section 2310 of the Pennsylvania Consolidated Statutes, 1 Pa. C.S. § 2310, which, *inter alia*, revived sovereign immunity. Section 2310 provides as follows:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy *sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.* When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

1 Pa. C.S. § 2310 (emphasis added).[10]

The above-emphasized language demonstrates that the General Assembly considers sovereign immunity to be a separate legal doctrine from "official immunity," which traditionally encompasses high public official immunity. *See Freach v. Com.*,

---

[10] Initially, Title I, Section 2310 of the Pennsylvania Consolidated Statutes did not contain language referring to Title 62 and procurement, as the Generally Assembly later added that reference through the Act of May 15, 1998, P.L. 358.

370 A.2d 1163, 1168 (Pa. 1977) ("The doctrine of official immunity in Pennsylvania is twofold: So-called 'high public officials' have been held to enjoy an absolute immunity from suits arising out of the performance of their duties. Other public officers and employes are protected by a more limited form of immunity.") (citations omitted). Title I, Section 2310 of the Pennsylvania Consolidated Statutes further establishes that only the General Assembly can waive "the immunity," *i.e.,* sovereign or official immunity. Section 2310 goes on to specifically address the impact of the waiver of sovereign immunity (without reference to official immunity), further suggesting that the General Assembly views sovereign immunity as a concept separate from official immunity. Of further note, the General Assembly enacted the Wiretap Act a mere week after enacting Section 2310 through Act 152. Consequently, in drafting and enacting the Wiretap Act, the General Assembly was keenly aware of the difference between sovereign and official immunity and that it was the sole body that could waive each immunity.

We now turn our attention to whether the General Assembly waived high public official immunity for purposes of Section 5725(a) actions under the Wiretap Act. In the context of addressing an issue concerning high public official immunity, we stated that this Court has "consistently held that where the General Assembly intends to provide exceptions to immunity, such exceptions must be specifically and explicitly expressed." *Doe*, 174 A.3d at 605. We further explained that, given that high public official immunity is intended to protect the public interest, exceptions to this immunity must be strictly construed. *Id.* at 605 n.12.

"Questions pertaining to statutory waivers of common law immunity are 'legislative in nature[.]'" *Id.* at 605 (quoting *Dorsey*, 96 A.3d at 340). In other words, we must discern whether the General Assembly intended to waive high public official immunity under the Wiretap Act. *Id.* Such a task is guided by the Statutory Construction Act of 1972,

1 Pa. C.S. §§ 1501-1991 (Statutory Construction Act). The Statutory Construction Act "directs that the object of all statutory interpretation is to ascertain and effectuate the intent of the General Assembly, which is best indicated by the plain language of the statute." *A Special Touch v. Dep't of Lab. & Indus.*, 228 A.3d 489, 502 (Pa. 2020). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b).

Prosecutors are "investigative or law enforcement officers" as that phrase is defined by the Wiretap Act. *See* 18 Pa. C.S. § 5702 (defining "investigative or law enforcement officer" as, *inter alia*, "any attorney authorized by law to prosecute or participate in the prosecution of such offense"). As noted above, however, the Wiretap Act broadly defines "person" as "[a]ny employee, or agent of the United States or any state or political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation." *Id.* Individual prosecutors, then, also qualify as "person[s]" under the Wiretap Act, both as individuals and as employees of Philadelphia, a political subdivision of the Commonwealth of Pennsylvania.[11]

Section 5725(a) of the Wiretap Act creates a cause of action against any person who violates the Act. 18 Pa. C.S. § 5725(a). If successful in that lawsuit, the aggrieved person is entitled to recover from the person sued actual damages, punitive damages, and reasonable attorney's fees and costs. *Id.* Prosecutors technically fit within the broad category of "persons" that may face suit pursuant to Section 5725(a). The next step in the inquiry is whether, by authorizing such a cause of action against persons, generally, the General Assembly also intended to curtail the affirmative defenses that any person sued under this section may raise in response. We conclude that it did not. Consequently,

---

[11] The DA Office itself does not qualify as a "person" subject to suit under Section 5725(a) of the Wiretap Act.

district attorneys and assistant district attorneys, though subject to suit under Section 5725(a), may raise the affirmative defense of official immunity in response and have the merit of that defense evaluated by the court.

In support of this conclusion, we initially highlight that, within the same section of the Wiretap Act that creates the very cause of action at issue, the General Assembly added that, "[t]o the extent that the Commonwealth and any of its officers, officials, or employees would be shielded from liability *by the doctrine of sovereign immunity, such immunity is hereby waived for the purposes of this section.*"  18 Pa. C.S. § 5725(b) (emphasis added).  The inclusion of this specific waiver of sovereign immunity is an express recognition by the General Assembly that Section 5725(a) does not, explicitly or implicitly, bar a person responding to the statutory claim from asserting affirmative defenses, particularly defenses of immunity from suit.  Indeed, if that had been the General Assembly's intent in Section 5725(a), it would have been unnecessary for the General Assembly to expressly waive sovereign immunity in Section 5725(b).  Clearly, the General Assembly felt the waiver was necessary to prevent *certain* persons sued under Section 5725(a)—the Commonwealth and its officers, officials, and employees— from raising a *particular* affirmative defense.  While the General Assembly expressly chose to head off the affirmative defense of sovereign immunity, it did not expressly foreclose other affirmative defenses, such as common law high public official immunity.[12] That affirmative defense, like all others not specifically barred by the statute, remains available to those entitled to assert it.

To put a finer point on this, there are many different types of "person[s]"— individuals and entities—subject to suit under Section 5725(a) of the Wiretap Act.  Certain

---

[12] As demonstrated above, sovereign immunity is distinct from high public official immunity.

affirmative defenses may be available to some defendants but not available to others. Section 5725(a) authorizes suits, but it does not clearly and explicitly address, let alone foreclose, affirmative defenses. The only affirmative defense clearly and expressly barred under Section 5725 is found in subsection (b), which clearly and expressly waives the affirmative defense of sovereign immunity for those entitled to assert it. Accordingly, while elected county district attorneys and assistant district attorneys may be subject to suit under Section 5725(a) because they fall within the Wiretap Act's broad definition of "person," neither the broad statutory definition of that term nor Section 5725(a) itself forecloses a district attorney or assistant district attorney from asserting any affirmative defense in response to a Section 5725(a) action. *See* Pa.R.Civ.P. 1030(a) (requiring affirmative defense of immunity from suit to be pleaded as "New Matter"); *but see Freach*, 370 A.2d at 1166 n.6 (allowing, without condoning, court to resolve immunity defense raised by preliminary objection where plaintiff does not object to procedural misstep). This all means that, while high public officials may be sued under Section 5725(a), they may also raise common law high public official immunity as an affirmative defense. *See Bisher v. Lehigh Valley Health Network, Inc.*, 265 A.3d 383, 400 n.10 (Pa. 2021) (observing that immunity from suit, particularly sovereign immunity, is in nature of affirmative defense that can be waived if not asserted).

Our conclusion is further supported by this Court's decision in *Doe* and the Commonwealth Court's opinion in *Hidden Creek, L.P. v. Lower Salford Township Authority*, 129 A.3d 602 (Pa. Cmwlth. 2015), *appeals denied*, 135 A.3d 587 (Pa. 2016). The *Doe* Court stated that, in interpreting the statute at issue in that case, "we are mindful that we may find immunity waived only where waiver is expressly stated, and we must construe exceptions to immunity strictly." *Doe*, 174 A.3d at 607. By way of example, we

noted our approval of the Commonwealth Court's decision in *Hidden Creek*. In so doing, we explained as follows:

> For example, in *Hidden Creek*, the defendant municipal authority sought immunity under the [Political Subdivision] Tort Claims Act from a complaint asserting excessive sewer tapping fees. [*Hidden Creek*,] 129 A.3d at 610. The Commonwealth Court correctly determined the General Assembly expressly waived immunity for lawsuits arising out of improper tapping fees by providing the following language in the Municipal Authorities Act[, 53 Pa. C.S. §§ 5601-5623]: "[a]ny person questioning the reasonableness or uniformity of a rate fixed by an authority . . . may bring suit *against the authority* in the court of common pleas of the county where the project is located." *Id.* at 611-12, *quoting* 53 Pa. C.S. § 5607(d)(9) (emphasis added). The statute included clear and unequivocal language waiving governmental immunity and provid[ed] an explicit statutory basis for suit specifically against the authority.

*Doe*, 174 A.3d at 607-08 (fourth alteration in original).

Unlike the language in Section 5607(d)(9) of the Municipal Authorities Act that explicitly permits suits to be brought against municipal authorities, Section 5725(a) of the Wiretap Act does not include "clear and unequivocal language waiving" high public official immunity or provide "an explicit statutory basis for suit specifically against" high public officials, such as district attorneys or assistant district attorneys. In other words, the Wiretap Act is silent regarding the applicability of high public official immunity to district attorneys and assistant district attorneys for purposes of Section 5725(a) actions.

Faced with this silence, Winig would have us scour the Wiretap Act and weave together various legislative pronouncements to find that the General Assembly waived high public official immunity under the Act. For example, Winig directs the Court to Sections 5713 and 5713.1 of the Wiretap Act.[13] Winig argues that Sections 5713(b) and 5713.1(c) "expressly contemplate" that law enforcement officers can be subject to actions brought pursuant to Section 5725(a) of the Wiretap Act. (Winig's Brief at 30.)

---

[13] Winig first referenced Sections 5713 and 5713.1 of the Wiretap Act in the application for reargument that he filed in the Commonwealth Court.

When emergency situations arise as outlined by Section 5713(a) of the Wiretap Act, the Act allows the Attorney General or a designated deputy attorney general, as well as a district attorney or an authorized assistant district attorney, to present an informal application to intercept wire, electronic, or oral communications. 18 Pa. C.S. § 5713(a). If a judge is satisfied that the application contains grounds that would allow for an interception, the judge "may grant oral approval for such interception without an order, conditioned upon the filing with him, within 48 hours thereafter, of an application for an order which, if granted, shall recite the oral approval and be retroactive to the time of such oral approval." *Id.* "In the event no application for an order is made, the content of any wire, electronic or oral communication intercepted shall be treated as having been obtained in violation of this subchapter." *Id.*

Section 5713(b) of the Wiretap Act provides:

In the event no application is made or an application made pursuant to this section is denied, the court shall cause an inventory to be served as provided in section 5716 (relating to service of inventory and inspection of intercepted communications) and shall require the tape or other recording of the intercepted communication to be delivered to, and sealed by, the court. Such evidence shall be retained by the court in accordance with section 5714 (relating to recording of intercepted communications) and *the same shall not be used or disclosed in any legal proceeding except in a civil action brought by an aggrieved person pursuant to section 5725* (relating to civil action for unlawful interception, disclosure or use of wire, electronic or oral communication) or as otherwise authorized by court order. In addition to other remedies and penalties provided by this chapter, failure to effect delivery of any such tape or other recording shall be punishable as contempt by the court directing such delivery. *Evidence of oral authorization to intercept wire, electronic or oral communications shall be a defense to any charge against the investigating or law enforcement officer for engaging in unlawful interception.*

18 Pa. C.S. § 5713(b) (emphasis added).

Starting with the sentence that invokes Section 5725 of the Wiretap Act, we recognize that only the Attorney General (or a designated deputy attorney general) and district attorneys (or authorized assistant district attorneys) can initiate the procedure set

forth in Section 5713(a) of the Wiretap Act. We further acknowledge that Section 5713(b) provides that evidence sealed under this section "shall not be used or disclosed in any legal proceeding except in a civil action brought by an aggrieved person pursuant to section 5725 . . . or as otherwise authorized by court order." 18 Pa. C.S. § 5713(b). We, however, reiterate that this Court cannot find that the General Assembly abrogated high public official immunity unless such intent is manifest. In this regard, we highlight that, like Section 5725(a), this sentence in Section 5713(b) does not explicitly sanction Section 5725(a) actions against high public officials, such as district attorneys or assistant district attorneys. Consequently, while Section 5713(b) indicates that evidence sealed under the section may be used or disclosed in Section 5725(a) actions, given the well-settled doctrine of high public official immunity, such suits can be pursued against "persons," generally, but against district attorneys and assistant district attorneys, specifically, only if they violated the Act while acting outside the scope of their official duties.

Section 5713(b) of the Wiretap Act goes on to provide that "[e]vidence of oral authorization to intercept wire, electronic or oral communication shall be a defense to any *charge* against the investigating or law enforcement officer for engaging in unlawful interception." 18 Pa. C.S. § 5713(b) (emphasis added). Yet, nothing in Section 5725(a) of the Wiretap Act suggests that a cause of action under that section—*i.e.*, a "civil cause of action"—is premised upon a "charge." Section 5703 of the Wiretap Act, however, criminalizes intentional violations of the Act and, therefore, is more amenable to a defense against a "charge"—*i.e.*, a criminal charge. *See* 18 Pa. C.S. § 5703 (explaining that person is guilty of felony of third degree if he violates Wiretap Act as outlined in Section 5703).

Section 5713.1 of the Wiretap Act fares no better. This section of the Wiretap Act is titled "[e]mergency hostage and barricade situations" and empowers the Attorney General or a district attorney to "designate supervising law enforcement officers for the purpose of authorizing the interception of wire or oral communications as provided in this section." 18 Pa. C.S. § 5713.1(a). Pursuant to Section 5713.1(b), a supervising law enforcement officer, under particular circumstances, is permitted to intercept a wire or oral communication without a court order. 18 Pa. C.S. § 5713.1(b). Section 5713.1(b) requires the supervising law enforcement officer to subsequently apply for an order approving the interception. *Id.* "In the event such application for approval is denied or in any other case where the interception is terminated without an order having been issued, the contents of any wire or oral communication intercepted shall be treated as having been obtained in violation of this subchapter," and a court ultimately must seal the intercepted communications under these circumstances pursuant to the procedure outlined in Section 5713(b). *Id.*

Section 5713.1(c) of the Wiretap Act provides, in relevant part: "A good faith reliance on the provisions of this section shall be a complete defense to any civil or criminal action brought under this subchapter or any other statute against any law enforcement officer or agency conducting any interceptions pursuant to this section . . . ." 18 Pa. C.S. § 5713.1(c). While this statute offers a "law enforcement officer or agency" a defense in "any civil or criminal action," Section 5713.1(c)'s general reference to actions that may be brought against such persons and entities—both within and outside the Wiretap Act—does not demonstrate that the General Assembly intended to "specifically and explicitly" abrogate high public official immunity enjoyed by district attorneys or assistant district attorneys for purposes of Section 5725(a) of the Wiretap Act.

Section 5713.1(c), therefore, is insufficient to act as a waiver of high public official immunity for these public officials. *Doe*, 174 A.3d at 605.

As this exercise demonstrates, attempting to discern whether the General Assembly waived high public official immunity by implication unnecessarily complicates the task at hand. Indeed, we have "recognize[d] permitting such implicit abrogation of high public official immunity would undermine the purpose and goal of the doctrine, the value of which has been consistently upheld and recognized by this Court." *Doe*, 174 A.3d at 608. Again, ascertaining legislative intent under these circumstances is guided by an inquiry into whether the General Assembly employed clear and unambiguous language waiving high public official immunity for purposes of Section 5725(a) of the Wiretap Act.

Consistent with this standard, we repeat that Section 5725(b) of the Wiretap Act establishes that the General Assembly understood both that it was necessary to expressly waive any immunity defense that may be asserted in response to a Section 5725(a) claim and how to do it. Yet, the General Assembly chose not to abrogate specifically and explicitly high public official immunity for purposes of suits brought pursuant to Section 5725(a) of the Wiretap Act. Because the General Assembly did not unequivocally waive high public official immunity under these circumstances, we hold that this affirmative defense is available to district attorneys and assistant district attorneys who are sued for monetary damages pursuant to Section 5725(a) of the Wiretap Act where they were acting within the scope of their official duties when they allegedly violated the Act.

Our holding is unswayed by the case law that Winig cites as supporting his position. We need not belabor this determination, as Prosecutors accurately point out that these cases "provide no relevant discussion of the [Wiretap] Act's treatment of the immunity afforded to prosecutors, nor are they inconsistent with that immunity."

(Prosecutors' Brief at 19.) Indeed, none of the cases upon which Winig builds his argument discuss the availability of high public official immunity in civil actions brought under Section 5725(a) of the Wiretap Act. *See Commonwealth v. Hashem*, 584 A.2d 1378, 1379 (Pa. 1991) (addressing "specific requirements governing the use of information intercepted under the provisions of the Wiretap Act . . . when the crime alleged is different from the targeted criminal activity that formed the basis for the original intercept order"); *Boettger v. Miklich*, 633 A.2d 1146, 1150 (Pa. 1993) (finding that good faith exception in Section 5725(c) of Wiretap Act was unavailable to state trooper, Commonwealth, or Commissioner of State Police in Section 5725(a) action); *Karoly*, 65 A.3d 310-13 (determining, in context of action seeking to remove from office detective and assistant district attorney under Section 5726 of Wiretap Act, that detective and assistant district attorney properly used tapes in performance of duties but that dissemination of tapes to media may have violated Act); and *Chiles v. Miller*, 288 A.3d 913, 919 (Pa. Super. 2023) (reversing grant of summary judgment in action under Section 5725(a) of Wiretap Act because assistant district attorney's disclosure of recordings may have violated Act).

Before concluding this opinion, we will address aspects of the dissenting opinions. In her dissent, Justice Mundy suggests that the General Assembly has codified high public official immunity into a "current" form and that this "current codification" was not in effect when the General Assembly passed the Wiretap Act in 1978. (*See* Justice Mundy's Dissenting Opinion at 3 (stating that "the current codification of high prosecutorial immunity was not in effect when the Wiretap Act was passed").) As best we can discern, Justice Mundy believes that the common law doctrine of high public official immunity was subsumed by the Political Subdivision Tort Claims Act, the Sovereign Immunity Act, or both. (*See id*. at 3-4 ("When the [Wiretap] Act went into effect, the statutory sovereign

immunities now codified in Pennsylvania's Tort Claims Acts did not exist. It was not until October 5, 1980—two years after the Wiretap Act became effective—that the General Assembly enacted the Political Subdivision Tort Claims Act . . . and the Sovereign Immunity Act[.]").) According to Justice Mundy,

> [b]ecause the [Political Subdivision Tort Claims Act] and [the Sovereign Immunity Act] were enacted after the passage of the Wiretap Act, the General Assembly could not, as the Majority contends, have intended to refer to our modern conception of sovereign immunity. Instead, it is clear that the General Assembly was referring to sovereign immunity in the common law context, which would include governmental immunity, official immunity, high public official immunity, and prosecutorial immunity.[14]

(*Id.* at 4.)

As an initial matter, Justice Mundy does not state with any specificity where the General Assembly expressed an intent to subsume the common law doctrine of high public official immunity in the Sovereign Immunity Act or the Political Subdivision Tort Claims Act. Moreover, as explained above, this Court has explicitly held that "[t]his common law doctrine of tort immunity[, *i.e.*, high public official immunity,] existed before enactment of the Political Subdivision Tort Claims Act . . . and was not abrogated by it." *Durham*, 772 A.2d at 69 (citing *Lindner*, 677 A.2d at 1196). We further highlight that, as recently as 2017, this Court reinforced the continued vitality of high public official immunity, referring to it as a "long-standing *category of common law immunity* that acts as an absolute bar to protect high public officials from lawsuits arising out of actions taken in the course of their official duties and within the scope of their authority." *Doe*, 174 A.3d at 603 (emphasis added). In addition, throughout this litigation, Prosecutors have made clear that they were invoking common law, not statutory, affirmative defenses, and Winig acknowledges this reality throughout his brief to this Court. (*See, e.g.,* Winig's Brief at 20

---

[14] We assume that, in these sentences, Justice Mundy is referring to the General Assembly's decision to waive "sovereign immunity" in Section 5725(b) of the Wiretap Act.

(arguing that "Prosecutors cannot rely upon common law immunity as a shield to avoid civil suit for damages under [Section] 5725 [of the Wiretap Act]").)

We also reject the notion that, when the General Assembly passed Act 152 and the Wiretap Act in 1978, the "common law concept" of "sovereign immunity" included "high public official immunity." Indeed, as early as 1952, this Court explained the doctrine of high public official immunity without reference to sovereign immunity. *Matson v. Margiotti*, 88 A.2d 892, 895-900 (Pa. 1952). As Justice Mundy points out, this Court has stated that "the *principle* of high public official immunity . . . is grounded in the same general, overarching *principle* of immunity for the public good, as derived from the English concept of sovereign immunity." Justice Mundy's Dissenting Opinion at 5 (citing *Doe*, 174 A.3d at 603) (emphasis added). Our observation that these immunities share an overarching, general principle does not, however, suggest that high public official immunity fell under a general doctrine of sovereign immunity when the General Assembly enacted the Wiretap Act. Moreover, in making this comparison in *Doe*, the Court stated that high public official immunity "serve[s] a *unique role* in protecting public officials while acting in their official capacity on behalf of the public." *Doe*, 174 A.3d at 603 (emphasis added).

Additionally, as to the term "official immunity," we observed the following in 1977: "To be distinguished from the constitutionally[ ]based doctrine of sovereign immunity in Pennsylvania is the common-law concept of 'official immunity'—a status which pertains to government officials and employees." *Freach*, 370 A.2d at 1168. While we acknowledge that the Sovereign Immunity Act and the Political Subdivision Tort Claims Act include various immunities and defenses, some of which resemble high public official

immunity,[15] we are not convinced that the common law doctrine of high public official immunity is now strictly a creature of statute.

While Justice McCaffery joins Justice Mundy's dissent, he writes separately, in part, because, in his view, Prosecutors' actions "give rise to civil liability under" the Wiretap Act. (Justice McCaffery's Dissenting Opinion at 1.) Indeed, despite the fact that this litigation is at the preliminary objection phase, Justice McCaffery appears to believe that, because Prosecutors' actions in the case were egregious, they should face liability under the Act. (*See, e.g.*, *id.* at 12 ("Here, it is evident the Prosecutors either made an egregious mistake, were grossly incompetent, or committed intentional misconduct.").) Justice McCaffery also seems to conclude that the issue and substantive legal test in this case are different than we contemplate.

In this regard, Justice McCaffery states: "At play in the present matter, we are presented with the tension between protecting individual privacy and empowering the government (and its officials) to carry out its work of servicing the public good." (*Id.* at 4.) According to Justice McCaffery, "[t]hus, in these matters, an individual's privacy interest should prevail over immunity for government officials, including those who fall under high public official immunity." (*Id.*) Justice McCaffery suggests that, in concluding that the General Assembly did not waive high public official immunity for purposes of an action under Section 5725(a) of the Wiretap Act, we have "missed the forest because of the trees." (*Id.* at 7.)

Respectfully, this matter does not involve many trees, let alone an entire forest. Rather, it involves one particular tree—the application of the well-settled legal principle

---

[15] *See, e.g.,* 42 Pa. C.S. § 8524 (enumerating common law defenses available under Sovereign Immunity Act); 42 Pa. C.S. § 8546 (defining "defense of official immunity" for purposes of Political Subdivision Tort Claims Act).

that the General Assembly may waive immunity only by specifically and explicitly expressing its desire to do so. Justice McCaffery criticizes our determination that the General Assembly did not express such an intent in the Wiretap Act for purposes of high public official immunity, characterizing our conclusion as "an absurd oxymoron," "nonsensical," and "illogical." (*Id.* at 9, 12.) Yet, in his view, "Section 5725(b) *specifically and unequivocally* includes reference to high public officials *without using the actual term itself.*" (*Id.* at 7 (emphasis added).) Justice McCaffery's belief in this regard rests, in part, upon the same inaccurate notion that Justice Mundy suggests—that is, the specific reference to "sovereign immunity" in Section 5725(b) necessarily includes high public official immunity—though Justice McCaffery seems to equivocate on this point. (*See, e.g.*, *id.* ("High public official immunity is an *offshoot* of sovereign immunity.") (emphasis added); and *id.* at 10 ("It is readily apparent that high public official immunity is *essentially a subset* of sovereign immunity, as it fundamentally seeks to establish immunity in service of the public good.") (emphasis added).)

In his dissenting opinion, Justice Dougherty offers myriad criticisms of our conclusion that the plain language of the Wiretap Act does not reflect that the General Assembly specifically and explicitly expressed an intent to waive high public official immunity for purposes of Section 5725(a) actions. For example, Justice Dougherty takes us to task for "wholly fail[ing] to explain **why** the General Assembly would have wanted to expose low-level and mere employees of the Commonwealth—but no other government actors, not even mere public employees' counterparts in local agencies—to liability under the Act." (Justice Dougherty's Dissenting Opinion at 7 (emphasis in original).) Yet, when interpreting a statute, our task is to ascertain and effectuate legislative intent, not to mine for the General Assembly's reason for choosing to codify a particular policy decision. This is true especially when, as here, the language of a statute

is clear and unambiguous. *See, e.g.*, 1 Pa. C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

Moreover, in support of his position, Justice Dougherty does not provide the full language of Section 5725(b), particularly the words "sovereign immunity" and "such;" nor does he focus his analysis, as we do, on that language. Instead, our colleague offers a tortured interpretation of both the Wiretap Act and this opinion. For example, on the one hand, Justice Dougherty expresses his view that the Wiretap Act "does *specifically and explicitly* waive official immunity," (Justice Dougherty's Dissenting Opinion at 14 (emphasis added)); yet, on the other hand, he states his belief that "the peculiar phrase 'the Commonwealth and any of its officers, officials or employees,' when considered against subsection (a)'s authorization of a cause of action against 'any person,' *creates a facial ambiguity*," (*id.* at 6 n.5 (emphasis added) (quoting 18 Pa. C.S. § 5725(b)).) Based upon his latter expression, Justice Dougherty employs principles of statutory construction that can be utilized only when "the words of a statute are not explicit," 1 Pa. C.S. § 1921(c), to discern whether the General Assembly "specifically and explicitly" waived high public official immunity in the Wiretap Act. By leaning into ambiguity, however, Justice Dougherty undermines his own position. Simply stated, our precedent does not support an analysis that would allow this Court to interpret an ambiguous statute as a clear and express waiver of high public official immunity. *See Doe*, 174 A.3d at 605 (explaining that this Court has "consistently held that where the General Assembly intends to provide exceptions to immunity, such exceptions must be specifically and explicitly expressed"). Indeed, in *Federal Aviation Administration v. Cooper*, 566 U.S. 284, 290 (2012), *i.e.*, the case that Justice Dougherty invokes in defense of his position that we can find that a statute is ambiguous and nevertheless conclude that the statute

specifically and explicitly waives immunity, the United States Supreme Court actually expressed: "*Any ambiguities* in the statutory language are to be *construed in favor of immunity*, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." (emphasis added) (citations omitted).

Of further note, Justice Dougherty suggests that we have "disregard[ed] our precedent relating to the General Assembly's use in statutes of all-encompassing phrases like 'any person.'" (Justice Dougherty's Dissenting Opinion at 9.) By way of example, the Justice relies upon a portion of this Court's decision in *Freach* to support his position that, by creating a cause of action for "any person" aggrieved by a violation of the Wiretap Act, the General Assembly waived high public official immunity for purposes of Section 5725(a) actions. Yet, the portion of *Freach* upon which the Justice's position relies has nothing to do with whether the General Assembly waived high public official immunity for purposes of a cause of action.

The plaintiffs in *Freach* brought survival and wrongful death actions against various defendants, including the superintendent of a state hospital, the superintendent of the parole division of the Board of Probation and Parole, a district attorney, and an assistant district attorney (collectively, government defendants). The Commonwealth Court sustained the government defendants' preliminary objections, concluding that they were high public officials and, therefore, "absolutely immune from suits arising out of the performance of their duties." *Freach*, 370 A.2d at 1166. The plaintiffs ultimately appealed to this Court.

In examining whether the Commonwealth Court properly determined that the government defendants were entitled to high public official immunity, we stated:

> Whether the Commonwealth Court was correct in finding these four defendants to be 'high public officials' is, however, a question we need not decide, for we have concluded that Section 603 of the Mental Health and

[Intellectual Disability] Act of 1966, 50 P.S. § 4603[16]. . . supersedes the common law doctrine of official immunity in cases in which the allegedly wrongful acts are done pursuant to that statute. We also are of the opinion, although the complaint is not entirely clear on the point, that the acts of the [government] defendants of which the plaintiffs complain were arguably acts done pursuant to the Act of 1966.

*Id.* at 1168. Section 603 of the Mental Health and Intellectual Disability Act provides:

*No person* and no governmental or recognized nonprofit health or welfare organization or agency *shall be held civilly* or criminally *liable for any diagnosis, opinion, report or any thing done pursuant to the provisions of this act if he acted in good faith and not falsely, corruptly, maliciously or without reasonable cause*; provided, however, that causes of action based upon gross negligence or incompetence shall not be affected by the immunities granted by this section.

50 P.S. § 4603 (emphasis added). Addressing the emphasized language, this Court

reasoned:

Although this language appears to grant or create, rather than to deny or waive, immunity from suits, its clear negative implication is that any person acting pursuant to the provisions of the act may be held liable for conduct which is lacking in good faith or is false, corrupt, malicious, or without reasonable cause.

*Freach*, 370 A.2d at 1168. We then added:

The statute goes on to provide, moreover, that 'causes of action based upon gross negligence or incompetence shall not be affected by the immunities granted by this section.' Thus, *Section 603 creates a limited immunity*—an immunity which is expressly inapplicable to several enumerated types of conduct. In our view, the phrase 'no person' is broad enough to include all officials of the Commonwealth and its governmental components whether 'high' or otherwise, as well as private persons. We therefore conclude that the use of the phrase 'no person' evidences an intent on the part of the legislature that the limited immunity granted by Section 603 will apply to all Commonwealth and governmental officials and will supersede common law officials immunity in cases to which Section 603 applies. Thus, a suit against even a 'high public official' may be maintained if it appears from the complaint (a) that the cause of action is based upon acts done pursuant to the Mental Health and [Intellectual Disability] Act of 1966, and (b) that the acts complained of are not within one of the categories of conduct to which limited immunity is granted by Section 603.

---

[16] Act of October 20, 1966, Special Session No. 3, P.L. 96.

*Id.*

Our decision in *Freach* makes clear that, if the General Assembly creates a statutory immunity applicable to "any person," that immunity can extend to private individuals as well as all officials of the Commonwealth and its governmental components. That principle, however, does not in any way suggest that, when the General Assembly creates *a cause of action* applicable to "any person," the General Assembly specifically and explicitly waived all affirmative defenses that any individual person or class of persons might be able to assert, including, but not limited to, high public official immunity. Consequently, in our view, this reasoning in *Freach* simply has no applicability in determining whether the General Assembly waived an established immunity.

Lastly, we again observe that Section 5725(b) of the Wiretap Act provides: "*To the extent that the Commonwealth and any of its officers, officials or employees* would be shielded from liability under this section by the *doctrine of sovereign immunity*, such immunity is hereby waived for the purposes of this section." 18 Pa. C.S. § 5725(b) (emphasis added). According to Justice Dougherty, by employing the word "officer" in this subsection, the General Assembly meant "public officers" and, therefore, expressed an intent to waive "official immunity." (Justice Dougherty's Dissenting Opinion at 14.) Yet, Section 5725(b) unmistakenly refers only to "the Commonwealth and any of its officers," *i.e.*, "the Commonwealth's officers," not "public officers," and to "sovereign" immunity, not "official" immunity. Moreover, it is not at all clear that the General Assembly intended "the Commonwealth's officers" in the Wiretap Act to include county district attorneys and assistant district attorneys.[17]

---

[17] *But see Phila. District Attorney's Office v. Williams*, 207 A.3d 410, 412 n.4 (Pa. Cmwlth. 2019) (holding, under Right-to-Know Law, that district attorney was local agency, not Commonwealth agency); *Schroeck v. Pa. State Police*, 362 A.2d 486, 490 (Pa. Cmwlth. 1976) (en banc) (declining to exercise original jurisdiction because "[d]istrict (continued…)

In sum, when the General Assembly creates a broadly sweeping cause of action, as it did in the Wiretap Act, against "any person" who violates the Act, the creation of the action, in and of itself, is insufficient to constitute a waiver of all immunity defenses that some persons may be able to assert as affirmative defenses. This is particularly true where the section authorizing such a cause of action also expressly waives one type of immunity, but not others. Instead, we reaffirm our precedent that where the General Assembly intends to waive those defenses for purposes of a newly created cause of action, it must do so expressly. We find the Dissents' approaches to answering the question before the Court to be counter to our settled standard of examining the language of a statute to determine whether the General Assembly "specifically and explicitly" expressed an intent to waive high public official immunity. Our interpretation, on the other hand, is faithful to this standard.[18] For these reasons, we respectfully disagree with the reasoning and result advocated by the Dissents.

---

attorneys and their assistants are officers of the counties in which they are elected and not officers of the Commonwealth").

[18] If, after reviewing this opinion, the General Assembly decides that high public officials should not be immune from Section 5725(a) actions, then it can simply revise the Wiretap Act to explicitly reflect that intent. *See Mullin v. Dep't of Transp.*, 870 A.2d 773, 786 (Pa. 2005) ("We reach our determination today keeping in mind that the exceptions to sovereign immunity are to be narrowly construed and that the General Assembly can correct any misinterpretation of the immunity provisions by amending the statute so as to explicitly waive immunity . . . ."). Had the dissenting Justices' interpretations of the Wiretap Act prevailed, we are hard pressed to imagine how the General Assembly could have revised the Act if it disagreed with those interpretations, save for amending Section 5725(b) to provide something along the following lines: "To the extent that the Commonwealth and any of its officers, officials or employees would be shielded from liability under this section by the doctrine of sovereign immunity, such immunity is hereby waived for the purposes of this section. *This waiver of immunity applies only to the doctrine of sovereign immunity and does not apply to the doctrine of high public official immunity.*"

## IV. Conclusion

While the General Assembly specifically and explicitly waived sovereign immunity for purposes of the cause of action outlined in Section 5725(a) of the Wiretap Act against the Commonwealth and its officers, officials, and employees, it did not specifically and explicitly waive the affirmative defense of high public official immunity. In response to Winig's suit here, then, Prosecutors were entitled, as they did, to raise the affirmative defense of high public official immunity. High public official immunity insulates district attorneys and assistant district attorneys from civil suits seeking monetary damages brought pursuant to Section 5725(a) of the Wiretap Act, where district attorneys and assistant district attorneys were acting within the scope of their official duties when they allegedly violated the Act. The Commonwealth Court reached the same result. We, therefore, affirm that court's order.

Chief Justice Todd and Justices Donohue and Wecht join the opinion.

Justice Dougherty files a dissenting opinion.

Justice Mundy files a dissenting opinion in which Justice McCaffery joins.

Justice McCaffery files a dissenting opinion in which Justice Mundy joins.